UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| NICOLE L. (PIPER) CADY,<br><br>                      Plaintiff,<br><br>    v.<br><br>HARTFORD LIFE & ACCIDENTAL<br>INSURANCE COMPANY,<br><br>                Defendant. | Case No. 3:10-CV-00276-EJL<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

Plaintiff Nicole Cady brings this action against Defendant Hartford Life and Accident Insurance Company claiming wrongful denial of accidental death benefits under 29 U.S.C. 1132(a)(1)(B).   The parties have filed cross motions for summary judgment. The issues have been fully briefed and are ripe for the Court's consideration.

Having fully reviewed the record herein, the Court finds that the facts and legal arguments are adequately presented in the briefs and record.   Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, this motion shall be decided on the record before this Court without a hearing.

**MEMORANDUM DECISION AND ORDER - 1**

## FACTUAL AND PROCEDURAL BACKGROUND

This is an Employment Retirement Income Security Act ("ERISA") case. Hartford Life and Accident Insurance Company ("Hartford") issued a group Accidental Death and Dismemberment insurance policy to Alliant Techsystems, Inc. ("ATK"), number ADD-S05459, for the benefit of eligible employees. (Dkt. 62, p. 2.)  Decedent Matthew Marsh, an eligible ATK employee under the Hartford Policy, died on May 28, 2008.  (*Id.*, p. 3.)  Plaintiff Nicole Cady ("Cady") is the former girlfriend of Mr. Marsh and was Mr. Marsh's named beneficiary under the Hartford Policy.  (Dkt. 29-1, HCF 116.)

Cady completed a Beneficiary Statement and Claimant's Statement of Accidental Death on July 10, 2008, indicating that Mr. Marsh's death was due to an "overdose of prescription and non-prescription drugs."  (*Id.*, HCF 121.)[1]  On July 18, 2008, Cady mailed the Statement of Accidental Death and the Certificate of Death for Mr. Marsh to Hartford.  (*Id.*, HCF 80.)   The Certificate of Death listed Mr. Marsh's cause of death as an "overdose of prescription and non-prescription drugs."  (*Id.*, HCF 118.)

Hartford approved Cady's claim for life insurance benefits on August 12, 2008, and thereafter paid Cady $42,000, plus interest in the amount of $109.32.  (Dkt. 62, p. 3.)  In order to review Cady's claim for accidental death benefits in the amount of $140,000,

---

[1] Most of Hartford's Claim File (designated herein as "HCF") was filed under seal pursuant to a Protective Order.

**MEMORANDUM DECISION AND ORDER - 2**

Hartford stated it would need the Coroner's Report, the Toxicology Report and a prescription list from the pharmacies used by Mr. Marsh between January 2008 and May 2008.  (Dkt. 29-1, HCF 58-59.)   Hartford notified Cady that it had requested a vendor to obtain the Coroner's Report and Toxicology Report, but asked that Cady submit Mr. Marsh's prescription lists.   (*Id.*)

Hartford received the Toxicology Report on September 11, 2008 and the Coroner's Report on October 20, 2008.   (Dkt. 70-9, p. 4.)   The Toxicology Report indicated that Mr. Marsh's blood tested positive for Alprazolam (an anti-anxiety drug more commonly known as Xanax), Duloxetine (an anti-depressant known as Cymbalta), Olanzapine (an anti-psychotic with the trade name Zyprexa), Methadone, and Cannabinoids (THC). (Dkt. 70-4, HCF 136-38.)   The Coroner's Report concluded that Mr. Marsh's death appeared to have been caused by an "accidental overdose." (Dkt. 29-1, HCF 52-53.)   The Coroner's Report suggested that Mr. Marsh's consumption of Xanax alone was four times the therapeutic range for Xanax.  (Dkt. 70-6, HCF 144.)   In the course of its review, Hartford also obtained copies of records from Dr. Michael Baldeck, Mr. Marsh's treating physician.  (Dkt. 70-1, HCF 125-26.)   Dr. Baldeck's records indicate that Mr. Marsh was being treated for anxiety and depression, and that Dr. Baldeck had prescribed Mr. Marsh Xanax, Cymbalta and Zyprexa.  (*Id.*)   Dr. Baldeck's records do not show that Mr. Marsh had a prescription for Methadone or that he was being treated by any other medical professional. (*Id.*)

**MEMORANDUM DECISION AND ORDER - 3**

Hartford did not receive Mr. Marsh's prescription list until January 10, 2011, over three years after Hartford initially requested the prescription list from Cady in August, 2008.[2]   (Dkt. 70-9, p. 6.)   Much of the factual history of this case involves the parties' dispute over their respective responsibility for obtaining, or, more accurately, failing to obtain, Mr. Marsh's prescription list from Walmart.[3]   Cady maintains that she was unable to initially acquire the prescription list because she was not a family member, that she made consistent and repeated attempts to procure the prescription list over several years, that she was ultimately forced to file a lawsuit in order to obtain the records from Walmart through use of the federal subpoena power, and that Hartford, by contrast, could have easily obtained the prescription list through its power under the Policy to conduct an investigation "without consent of the insured or the insured's family."   (Dkt. 66, pp. 5-6.)   Hartford counters that it left unanswered messages for Cady stating it needed the pharmacy records

---

2  During the course of the parties' argument over responsibility for obtaining the prescription list, Cady initially filed suit in Idaho state court on April 27, 2010.   (Dkt. 65, p. 2.)   Hartford removed the case to this Court on June 1, 2010.   (Dkt. 1.)   On April 12, 2011, after Cady had provided Hartford with the Walmart prescription list, this Court granted Hartford's Motion to Stay the case so that Hartford could complete administrative review of Cady's claim. (Dkt. 56.)   After the review, Hartford denied the claim.   (Dkt. 70-4, HCF 136-38.)   Cady appealed and Hartford affirmed its denial.   (Dkt. 70-5, HCF 140-42.)   Cady thereafter filed a motion to re-open this case, which the Court granted on December 1, 2011.   (Dkt. 61.)

3  Dr. Baldeck's records indicated that Mr. Marsh filled his prescriptions at Walmart. (Dkt. 70-1, HCF 125-26.)   Neither party knows if Mr. Marsh filled prescriptions at any other pharmacy, and no pharmacy records other than that from Walmart were obtained during the course of Hartford's administrative review.   During Hartford's review, Cady's attorney confirmed that he had no documentary evidence to confirm that Mr. Marsh had a prescription for Methadone.   (Dkt. 70-3, HCF 133.)

**MEMORANDUM DECISION AND ORDER - 4**

for nearly a year, that it closed the file after notifying Cady on October 2, 2009 that it could not make a decision with respect to accidental death without the pharmacy records, that it did not receive notice from Cady that she was having difficulty obtaining the prescription list until January 13, 2009, that it re-opened the file to examine Cady's claim once it ultimately received the prescription list on January 10, 2011, and that Hartford, like Cady, did not have the power to compel production of pharmaceutical records without a subpoena.[4]   (Dkt. 70-9, pp. 4-6; Dkt. 75, p. 7.)   Once it was ultimately obtained by Cady, Mr. Marsh's prescription list revealed that he did not have a prescription for Methadone with Walmart.   (Dkt. 71-1, HCF 131.)

Once the prescription list was secured, Hartford completed its review, determined that the evidence did not establish a covered loss under the terms of the Policy, and denied Cady's claim.   (Dkt. 70-4, HCF 136-38.)   Hartford's May 6, 2011 denial letter ("Initial Denial") explained that Mr. Marsh's death did not meet the definition of "Injury" required for purposes of accidental death coverage under the Policy.   Specifically, the Policy defines "Injury" as:

> …bodily injury resulting directly from accident and independently of all other causes which occurs while the Covered Person is covered under the policy.   Loss resulting from: a) a sickness of disease, except a pus-forming infection which occurs through an accidental wound; or b) medical or surgical treatment of a sickness or disease; is not considered as resulting from injury.

---

4 Cady also claims Hartford could have potentially accessed material information with respect to Mr. Marsh's prescriptions through Idaho and Washington's prescription drug monitoring programs, thereby eliminating the burden Hartford placed upon her to obtain Mr. Marsh's prescriptions.   (Dkt. 73, p. 9.)   Hartford maintains that it cannot access prescription drug monitoring databases without a court order.   (Dkt. 75, p. 7.)

**MEMORANDUM DECISION AND ORDER - 5**

(*Id*., HCF 136.)

Hartford concluded that, to the extent Mr. Marsh's fatal overdose resulted from taking Xanax, Cymbalta and Zyprexa, the medicines prescribed to treat his ongoing depression and anxiety, such loss was a result of "medical or surgical treatment of a sickness or disease," and thus did not meet the definition of Injury required for covered losses under the Policy.   (*Id*., HCF 138.)   In addition, Hartford explained that, to the extent Mr. Marsh's death was caused by Methadone, a drug for which he presumably had no prescription, Mr. Marsh's death was excluded from coverage under the Policy Exclusion providing:

> The Policy does not cover any loss resulting from…6) Injury sustained while voluntarily taking drugs which federal law prohibits dispensing without prescription, including sedatives, narcotics, barbiturates, amphetamines, or hallucinogens, unless the drug is taken as prescribed or administered by a licensed physician.[5]

(*Id*., HCF 136-37.)

In its Initial Denial, Hartford encouraged Cady to submit any additional information she believed would support her claim, and suggested such information would include "documentation that confirms a prescription was written for Methadone, the medical records that establish the basis for the Methadone prescription, and any evidence…that Mr. Marsh took Methadone as prescribed by a physician."   (*Id*., HCF 138.)   The Initial Denial also instructed Cady that she had a right to appeal the decision, and gave her directions on perfecting an appeal.   (*Id*.)

---

5 Methadone legally requires a prescription.   (Dkt. 70-9, p. 4.)

**MEMORANDUM DECISION AND ORDER - 6**

Cady appealed the Initial Denial on June 20, 2011. (Dkt. 70-5, HCF 140-42.) Cady's appeal letter contended that Hartford had failed to adequately investigate Mr. Marsh's death, had failed to meet its burden in establishing the non-prescription drug exclusion, had failed to provide a scientific or clinical judgment for its determination, and, through such failures, had deprived Cady of an opportunity to offer expert opinions regarding the evidence upon which Hartford relied. (*Id.*) However, Cady did not submit any additional evidence or expert analysis with her appeal. Hartford thereafter referred Cady's claim to its Appeal Unit to conduct an independent review. (Dkt. 70-6, HCF 143-45.)

After independent review, Hartford re-affirmed its denial of Cady's claim. In its September 8, 2011 denial letter ("Final Denial"), Hartford again explained that Mr. Marsh's death was not a covered loss under the Policy, due to both the definition of "Injury" required for a covered loss and the non-prescription drug exclusion. (*Id.*) The Final Denial further explained:

> Please note that the Policy requires that a benefit will be paid if an accidental injury occurs. We do not interpret the word "accident" to include circumstances where it is reasonably foreseeable that death will occur. Accidents by nature are unforeseeable events. It is a well-known fact that if [sic] consuming four (4) times the therapeutic dose of Xanax and also ingesting Methadone can cause serious bodily injury or death. It is our opinion that Mr. Marsh should have reasonably foreseen that such actions would result in severe injury or death, even if death was not intended. The assumption of a known risk by the insured does not constitute an "accident" and the result of that assumption, death in this circumstance, does not constitute a covered injury under the terms of the Policy.

(*Id.*, HCF 145.)

**MEMORANDUM DECISION AND ORDER - 7**

Cady sued under 29 U.S.C. § 1132(a)(1)(B), the provision of ERISA allowing for civil actions to recover benefits under an ERISA plan.   (Dkt. 62.)   The parties have filed cross-motions for summary judgment.   (Dkt. 64; Dkt. 70.)

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence in a light most favorable to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).   The moving party bears the burden of showing that there is no material factual dispute, and the court must draw all reasonable inferences in favor of the party against whom summary judgment is sought.   *Celotex*, 477 U.S. at 324.   Material facts which would preclude summary judgment are those which may affect the outcome of the case.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   The relevant substantive law will determine which facts are material for purposes of summary judgment.   *Id.*

Where, as here, both parties move for summary judgment, the summary judgment standard does not change, and the court must evaluate each party's motion on the merits. *Farm Bureau Ins. Co. of Idaho v. Kinsey*, 234 P.3d 739, 742 (Idaho 2010) (citation omitted); *see also Nolan v. Heald College*, 551 F.3d 1148, 1154 (applying traditional summary judgment standards to cross-motions for summary judgment in ERISA benefits

**MEMORANDUM DECISION AND ORDER - 8**

denial case).   Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of showing there is no genuine issue of material fact by demonstrating an "absence of evidence to support the nonmoving party's case."   *Celotex*, 477 U.S. at 325.   If the moving party establishes an absence of evidence to support the non-moving party's case, the burden then shifts to the opposing party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists."   *Bhan v. NME Hosp. Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). A complete failure of proof concerning an essential element of the non-moving party's case renders all other facts immaterial.   *Celotex*, 477 U.S. at 323.

Where the moving party instead bears the burden of proof on an issue at trial, "it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a *prima facie* showing in support of its position on that issue.   That is, the moving party must prevent evidence that, if uncontroverted at trial, would entitle it to prevail on that issue.   Once it has done so, the non-moving party must set forth specific facts controverting the moving party's *prima facie* case."   *Sabatino v. Liberty Life Assur. Co. of Boston*, 286 F.Supp.2d 1222, 1229 (N.D. Cal. 2003) (*citing UA Local 343 v. Nor-Cal Plumbing, Inc*., 48 F.3d 1465, 1471 (9th Cir. 1994)).

**MEMORANDUM DECISION AND ORDER - 9**

## ANALYSIS

### 1.   ERISA Standard of Review

In actions challenging denials of benefits pursuant to 29 U.S.C. § 1132(a)(1)(B), the district court reviews *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan unambiguously confers discretionary authority, then the standard of review shifts to abuse of discretion. *Id.*; *see also Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 (9th Cir. 1999).

The first step of analysis is thus to examine whether the terms of the ERISA plan unambiguously grant discretion to the administrator.   The Hartford Policy provides, "[t]he Plan has designated and named the Insurance Company as the claims fiduciary for benefits provided under the Policy.   The Plan has granted the Insurance Company full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy."   (Dkt. 29-1, HCF 25.)

Cady suggests this provision is ambiguous because Defendant reserved discretion in "specified areas" but did "not reserve discretion regarding whether it could excuse the procedure set forth in the plan" and could not "reserve discretion regarding whether it needs to satisfy the duties to the beneficiary of the insured."   (Dkt. 66, p. 4.)   However, the Supreme Court has counseled that a plan grants discretion if the administrator has the "power to construe disputed or doubtful terms" in the plan.   *Firestone*, 489 U.S. at 115

**MEMORANDUM DECISION AND ORDER - 10**

(noting that if a plan grants an administrator the right to determine eligibility for benefits or to "construe the terms of the plan," it has discretionary authority).   Moreover, the Ninth Circuit has repeatedly held that plan wording which, like the language at issue, grants the power to interpret plan terms and to make final benefits determinations confers discretion on the plan administrator.   *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (*citing Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc*., 293 F.3d 1139, 1142 (9th Cir. 2002) and *Grosz-Salomon v. Paul Revere Life Ins. Co*., 237 F.3d 1154, 1159 (9th Cir. 2001)).   The Hartford Policy bestows on the administrator full discretion and authority to both interpret all terms and provisions of the plan and to determine eligibility for benefits.   Under Ninth Circuit and Supreme Court precedent, the Policy clearly vests discretion in the Hartford plan administrator.

After finding the plan unambiguously confers discretion, the Court would ordinarily proceed to review of the plan decision under the deferential abuse of discretion standard of review.   An ERISA administrator abuses its discretion only if it: "(1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact."   *Boyd v. Bell*, 410 F.3d 1173, 1178 (9th Cir. 2005).   However in this case, a less deferential standard is triggered because Hartford operates under a structural conflict of interest.   A structural conflict of interest exists where, as here, an insurer acts as both the administrator

**MEMORANDUM DECISION AND ORDER - 11**

and funding source for an ERISA plan.[6]   *Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 976 (9th Cir. 1999).

The Supreme Court has indicated that a structural conflict of interest, even if merely formal and unaccompanied by any evidence of bad faith or self-dealing, should have some effect on judicial review.   *Firestone*, 489 U.S. at 115.   In *Abatie*, the Ninth Circuit clarified that *Firestone* requires abuse of discretion review whenever an ERISA plan grants discretion to the plan administrator, but that such review must be "informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record."   *Abatie*, 458 F.3d at 967.   The level of skepticism "with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history."   *Id*. at 968.   The *Abatie* Court counseled a conflict of interest should be weighed more heavily if, for example, the administrator provides inconsistent reasons for denial, fails to adequately investigate a claim or ask the plaintiff for necessary evidence, fails to credit a plaintiff's reliable evidence, or has

---

6  A conflict of interest exists in such circumstances because, while the administrator is responsible for administering the plan so that those who deserve benefits receive them, the administrator also "has an incentive to pay as little in benefits as possible to plan participants because the less money the insurer pays out, the more money it retains in its own coffers."   *Abatie*, 458 F.3d at 966 (citation omitted).

**MEMORANDUM DECISION AND ORDER - 12**

repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.[7]   *Id*.

In order to weigh a conflict of interest more heavily, the beneficiary must provide "material, probing evidence beyond the mere fact of the apparent conflict, that tends to show that the administrator's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary."   *Sabatino*, 286 F.Supp.2d at 1230.   If the beneficiary meets this threshold burden, then a rebuttable presumption is created that the plan's decision was a dereliction of its fiduciary responsibilities.   *Id*.   The plan then bears the burden of rebutting this presumption by producing evidence that the conflict of interest did not affect its decision to deny benefit.   *Id*.   If the plan fails to carry this burden, then the Court will review the denial of benefits *de novo*.[8]   *Id*.; *see also Tremain v. Bell Indus*., 196 F.3d at 976.

Cady devotes much of her briefing to establishing Hartford's conflict of interest improperly affected its denial of benefits.   Specifically, Cady maintains that Hartford

---

7  As the *Abatie* Court noted, "when a plan administrator's actions fall so far outside the strictures of ERISA that it cannot be said that the administrator exercised the discretion that ERISA and the ERISA plan grant, no deference is warranted."   *Id*. at 972.

8  If Cady presents probative evidence that Hartford's self-interest caused a breach of fiduciary duties, and if Hartford fails to rebut this presumption, the burden of proof with respect to entitlement of benefits does not, as Cady suggests, shift to Hartford to establish its decision was not the result of a dereliction of fiduciary duties.   (Dkt. 73, p. 4.)   Rather, such evidence would instead simply alter the standard of review—from abuse of discretion to *de novo*.   Cady still has the burden of proving coverage under the plan even if Hartford fails to rebut the presumption that it acted under a conflict of interest.

**MEMORANDUM DECISION AND ORDER - 13**

provided inconsistent reasons for denial, failed to adequately investigate Cady's claim, ignored Cady's offer to participate in the review process, and interpreted two exceptions found within the Policy in such a manner as to frustrate the very purpose of the contract.

### a.     Inconsistent reasons for denial

Cady maintains Hartford's Initial Denial did not deny benefits on the grounds that the death was not accidental, but rather on the grounds that the death was either not an "injury" under the Policy or was not covered under exclusion six of its policy.   (Dkt. 72, p. 3.)   Cady argues that Hartford's Motion for Summary Judgment added a new argument that Mr. Marsh's death was not "accidental" under the policy, and that this represents an inconsistent reason for denial.   Cady's argument is unavailing.   The Hartford Policy clearly states that coverage applies only to "injury," and defines "injury" as "bodily injury resulting directly from accident and independently of all other causes which occurs while the Covered Person is covered under the policy.   Loss resulting from…medical or surgical treatment of sickness or disease…is not considered as resulting from Injury."   (Dkt. 29-1, HCF 19-20.)   Thus, in order to be considered a covered loss under the accidental death policy, Mr. Marsh's death must have been (1) caused by an "accident" and (2) have resulted independently from medical treatment of sickness or disease.    Both Hartford's Initial Denial and Final Denial explain that Mr. Marsh's death did not meet the definition of "injury" required for accidental death coverage.   As such, both denials were necessarily premised on a finding that the death was not an accident, as the definition of "injury" in the

**MEMORANDUM DECISION AND ORDER - 14**

policy establishes what loss is covered as accidental.   Hartford has not offered inconsistent reasons for denial.

   b.      *Failure to adequately investigate*

   Cady claims Hartford failed to adequately investigate her claim and instead gathered only enough information needed to support its denial, and then placed the burden on Cady to provide any other evidence.   (Dkt. 72, p. 4.)   When considering a claim for benefits, ERISA administrators have a duty to adequately investigate the claim.   *Booton v. Lockheed Medical Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997).   This requires that the plan administrator engage in "meaningful dialogue" with the beneficiary.   *Id*.   If the administrator "believes more information is needed to make a reasoned decision, they must ask for it."   *Id.*

   When investigating Cady's claim, Hartford obtained the Death Certificate, the Coroner's Report, the Toxicology Report, the records from Mr. Marsh's only known treating physician, and the Statement of Coverage.   Each of these documents, including Cady's own assertions in the Statement of Coverage, supported the conclusion that Mr. Marsh's death was the result of an overdose.   Dr. Baldeck's records established that Mr. Marsh had prescriptions for Xanax, Cymbalta and Zyprexa.   Because it did not have evidence of a prescription for Methadone, Hartford asked Cady to provide Mr. Marsh's prescription records, as well as any other evidence to establish Mr. Marsh had such a prescription.   (Dkt. 70-4, HCF 136-38.)   Hartford also invited Cady to submit any

**MEMORANDUM DECISION AND ORDER - 15**

additional evidence which would assist it with evaluating her claim.   (*Id*.)   Although she submitted Mr. Marsh's prescription list, Cady declined to submit any additional information.

This Court finds Hartford conducted a sufficiently thorough investigation to justify its decision to deny benefits.   All the information Hartford had when making its decision was compatible with a finding of death by overdose of prescription and non-prescription drugs.   There was no evidence of any cause of death other than an overdose of prescription and non-prescription drugs.   Hartford also asked Cady for additional evidence—the prescription list—it felt was needed to make a decision.   Although Cady claims it was abusive for Hartford to place the burden of obtaining the prescription list upon her, there is no evidence that Hartford had any greater access to or knowledge of Mr. Marsh's prescriptions.   Indeed, as Mr. Marsh's former girlfriend, Cady was in a better position to know both where Mr. Marsh filled his prescriptions and whether he took non-prescription drugs than was Hartford.   As the Fifth Circuit explained in *Vega v. Nat'l Life Ins. Servs., Inc*., 188 F.3d 287, 298 (5th Cir. 1999) (en banc), "[t]here is no justifiable basis for placing the burden solely on the administrator to generate evidence relevant to deciding the claim, which may or may not be available to it, or which may be more readily available to the claimant."

**MEMORANDUM DECISION AND ORDER - 16**

### c.   Failure to allow participation in the claims process

Cady contends Hartford failed to consider the expert opinion of Dr. Carl Wigren, M.D., a toxicologist, when conducting its review, and that such failure constituted an abuse of Hartford's fiduciary duty.   During Hartford's review, Cady raised the issue of the need for an expert toxicologist, and suggested her expert called into doubt the validity of the Toxicology Report for Mr. Marsh.   Cady's attorney invited Hartford to depose Cady's expert, and represented portions of the expert's opinion in various letters to Hartford during the review process.   However, Cady's attorney failed to ever name Dr. Wigren, failed to submit an expert report, and failed to submit any evidence to Hartford to show that Mr. Marsh's death was the result of anything other than an overdose of prescription and non-prescription drugs.[9]

ERISA administrators may not "shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement."   *Rodgers v. Metropolitan Life Ins. Co.*, 655 F.Supp.2d 1081, 1087 (N.D. Cal. 2009) (citations omitted).   However, if a plan participant fails to bring evidence to the attention of the administrator, the participant cannot complain of the administrator's failure to consider such evidence.   *Sandoval v. Aetna Life and Cas. Ins. Co.*, 967 F.2d 377, 381 (10th Cir. 1992).   The Initial Denial notified Cady that Hartford was relying, at least in part, on the Coroner's Report and the Toxicology Report.

---

[9] In fact, the expert report submitted to the Court is dated November 23, 2011.   (Dkt. 67-1, Ex. D.)   The report was thus not prepared until after Hartford completed its review, as well as two months after Hartford's September 8, 2011 Final Denial.

**MEMORANDUM DECISION AND ORDER - 17**

Cady thus had notice that evidence which would undermine the Toxicology Report would be relevant to Hartford's benefit determination.   Hartford also invited Cady, who was represented by counsel throughout the review process, to submit any additional evidence which would support her claim.   Cady could have submitted her expert report at any stage of the review, but declined to do so.   Hartford cannot be found to have breached its fiduciary duty by failing to consider an expert report that was never before it.[10]   *Id.*; *see also Davidson v. Prudential Ins. Co. of America*, 953 F.2d 1093, 1095 (8th Cir. 1992) (finding claimant was required to submit evidence he believed was necessary to make a proper benefits determination to the administrator, and could not attempt to later challenge the administrator's decision by submitting such evidence to the court).

        *d.*    *Policy interpretation*

     Finally, Cady maintains that Hartford's interpretation of the Policy combined "two discrete provisions to exclude coverage in a host of scenarios where a person of average intelligence and experience would consider themselves covered."   (Dkt. 66, p. 9.) Specifically, Hartford concluded that the drugs found in Mr. Marsh's system were either taken pursuant to medical treatment of a sickness or disease or were not being taken in accordance with a prescription.   If the drugs were being taken in accordance with medical treatment, then Mr. Marsh's death was not an "injury" under the Policy.   However, if Mr. Marsh did not have a prescription for the drugs in his system, then his death was not a covered loss due to the Policy exclusion for "injury" sustained while voluntarily taking

prescription drugs without a prescription.   Cady claims Hartford thus used two discrete Policy provisions to exclude coverage any time a person is found to have had prescription and non-prescription drugs in their system, even if they died due to a totally unrelated accident.   (Dkt. 66, pp. 9-10.)

When considering questions of insurance policy interpretation under ERISA, federal courts apply federal common law.   *Padfield v. AIG Life Ins. Co*., 290 F.3d 1121, 1125 (9th Cir. 2002).   Under the federal common law of ERISA, federal courts "interpret terms in ERISA insurance policies in an ordinary and popular sense, as would a person of average intelligence and experience."   *Id*.   The interpretation of an insurance policy is a question of law, and any ambiguities in the plan are construed against the insurer.   *Evans v. Safeco Life Ins. Co*., 916 F.2d 1437, 1441 (9th Cir. 1990); *Kunin v. Benefit Trust Life Ins. Co*, 910 F.2d 534, 539 (9th Cir. 1990).   Cady assigns fault to Hartford's reliance on the definition of "injury," when construed in conjunction with the Policy exclusion for use of drugs without a prescription.   The Court will accordingly consider whether such provisions are ambiguous when interpreted to exclude coverage.

As previously mentioned, the Hartford Policy provides coverage for death resulting from "injury."   (Dkt. 29-1, HCF 19.)   "Injury" is defined as "bodily injury resulting directly from accident and independently of all other causes which occurs while the Covered Person is covered under the policy.  Loss resulting from…medical or surgical treatment of a sickness or disease is not considered as resulting from Injury."   (*Id*.)   The Policy does not define medical treatment of sickness or disease.   When a term is not

**MEMORANDUM DECISION AND ORDER - 19**

defined, the Courts will look to the normal usage and definition of that term.   *Evans*, 916 F.2d at 1441.

The term "treatment" means a "broad term covering all the steps taken to affect a cure of an injury or disease; including examination and diagnosis as well as application of remedies."   Black's Law Dictionary, 1502 (6th ed. 1990).   This Court and other courts have previously held that the administration of prescription medications is considered medical care or treatment.   *Cole v. Delaplain*, 2010 WL 4909586 (1:08-CV-00476) (discussing prisoner claims regarding alleged withholding of prescription medications as medical treatment); *see also Wilson v. Business Men's Assur. Co*., 181 F.2d 88, 89 (9th Cir. 1950) (medical treatment extended to drug prescribed for treating insured's ailment); *Pickard v. Transamerica Occidental Life Ins. Co*., 663 F.Supp. 126, 127 (E.D. Mich. 1987) (death due to drinking wrong solution in preparation for colonoscopy was medical treatment under accidental death policy); *Reid v. Aetna Life Ins. Co*., 440 F. Supp. 1182, 1183-84 (S.D. Ill. 1977) (accidental injection of lethal drug considered death caused by medical and surgical treatment).

In *Barkerding v. Aetna Life Ins. Co*., the Fifth Circuit explained "[m]edical and surgical treatment mean what is done by a physician…in diagnosing a bodily ailment and seeking to alleviate or cure it.   It includes the things done by the patient to carry out specific directions given for these ends by a physician."   82 F.2d 358, 359 (5th Cir. 1936). Dr. Baldeck's prescription of Xanax, Cymbalta and Zyprexa to alleviate Mr. Marsh's

depression and anxiety constituted medical treatment under the clear meaning of the Hartford Policy.

The terms "sickness" and "disease" are also not defined in the Policy.   However, in giving these terms their ordinary meaning, bi-polar disease and depression can be considered sickness or disease.   The Ninth Circuit has determined the term "disease" includes an "ailment or disorder of an established or settled character to which the insured is subject," as opposed to a more "temporary" or "slight" ailment.   *Chale v. Allstate Life Ins. Co*., 353 F.3d 742, 749 (9th Cir. 2003).   The Diagnostic and Statistical Manual of Mental Disorders IV describes bipolar disorder and depression as potentially lasting an entire lifetime, with a significant number of persons never receiving relief through treatment.   Diagnostic and Statistical Manual of Mental Disorders IV-TR 296 (4th Ed. 2000).   Moreover, federal courts have determined depression constitutes a "sickness." *Heffernan v. UNUM Life Ins. Co. of Am*. 101 Fed Appx. 99, 108 (6th Cir. 2004) (finding insured suffered from a "sickness" when examining physicians found that the insured suffered from depression); *Paul Revere Life Ins. Co. v. Forester*, 32 F.Supp.2d 352, 354 (W.D.N.C. 1998) (insured suffered from depression, which qualified as a "sickness"). Mr. Marsh's on-going depression constituted a "sickness" or "disease" under the plain meaning of the Hartford Policy.

The Hartford prescription drug exclusion provided "[t]he policy does not cover any loss resulting from…Injury sustained while voluntarily taking drugs which federal law prohibits dispensing without a prescription, including sedatives, narcotics, barbiturates,

**MEMORANDUM DECISION AND ORDER - 21**

amphetamines, or hallucinogens, unless the drug is taken as prescribed or administered by a licensed physician."   (Dkt. 29-1, HCF 20.)   Cady argues this exclusion, when read in conjunction with the definition of "injury," constituted an absurd policy interpretation which would exclude coverage in a host of scenarios where death should be covered as accidental. However, as the Court explained when considering essentially identical provisions in *Grobe v. Vantage Credit Union*, 679 F.Supp.2d 1020 (E.D. MO. 2010), Hartford's interpretation of "injury" in conjunction with the prescription drug exclusion is neither ambiguous nor absurd.

As the *Grobe* Court held, the prescription drug exclusion is not rendered moot by the Policy's definition of injury:

> [I]magine two individuals covered under [the] policy each broke a bone in an accident.   To deal with the pain from the break and surgery, both individuals then took a drug that, under federal law, cannot be dispensed without a prescription. Individual One went to the doctor to get the prescription.   Individual Two took the medication from her friend, who had been prescribed the medication from a former accident.   If both individuals died of overdoses, Individual One would be covered by [the] policy, and Individual Two would not.   Both individuals suffered a loss under the definition of injury in the policy because they were taking the medication because of an accident, and not as 'medical or surgical treatment of a sickness or disease.'   The prescription drug exclusion is triggered because both individuals took regulated drugs, and suffered an injury while doing so.   Individual Two cannot collect on the policy because her injury was 'sustained while voluntarily taking drugs' and she did not have a prescription.   Individual One can collect, however, because, unlike Individual Two, she received a prescription for her drugs because of the original accident.

*Id*. at 1033.

**MEMORANDUM DECISION AND ORDER - 22**

The *Grobe* Court went on to explain the distinction between losses resulting from drug use prescribed as treatment for a sickness or disease and those resulting from use of drugs without a prescription is based:

> … it seems, on the difference between a death that is 'foreseeable' or in some way related to an assumed risk, and one that is not.   AD&D policies are intended to cover accidental deaths and losses, not all deaths and losses.   The medical treatment exclusion is intended to exclude coverage for those individuals who have assumed the risks of medical treatment, including the possibility of death.   Courts have consistently held that a medical treatment exclusion applies to accidental death caused by an overdose of drugs prescribed by a doctor in the course of a treatment for a sickness or disease.   Death caused by sickness or disease, and the medical treatment sought for such, is not unforeseeable.   The prescription drug language further excludes those losses that occur when an individual takes regulated drugs without a prescription.   Taking regulated drugs without a prescription is the sort of assumed-risk behavior that could make a loss foreseeable….The exception to the prescription drug exclusion, for when an individual is prescribed a regulated drug by a physician for something unrelated to disease or sickness, and suffers a loss while taking that drug, recognizes the difference between taking drugs illegally and taking them legally.   This exception to the exclusion does not, however, modify the definition of 'injury' found at the beginning of the policy, which specifies that losses resulting from medical treatment of a sickness or disease are not injuries. The two provisions do not conflict, and the insurance policy is not ambiguous.

*Id*.

Under the Hartford Policy, the initial question is whether there was a covered "injury."   If a drug is taken by an individual in the course of medical treatment or disease, and a loss result from that drug use, there is no injury and the inquiry ends.   *Id*. at 1033. Thus, to the extent Mr. Marsh's death was caused by a combination of Xanax, Cymbalta and Zyprexa, his death was not a covered "injury" under the Policy.   However, if a drug was taken for a reason unrelated to sickness or disease, then the prescription drug provision is triggered, and the source of the drug must be examined.   *Id*.   To the extent Mr. Marsh's

**MEMORANDUM DECISION AND ORDER - 23**

death was caused by Methadone, a drug for which he presumably had no prescription, his death does not constitute an accidental loss under the prescription drug exclusion. Although they dispute the exact drug or combination of drugs which caused Mr. Marsh's death, the parties do not dispute that Mr. Marsh's death was caused by an accidental overdose. Whether Mr. Marsh's overdose was the result of medical treatment for depression or the result of his use of Methadone without a prescription, his loss was not covered as an accidental death under the unambiguous terms of the Policy.[11]

In sum, the Court determines Cady has not presented material probative evidence that Hartford's decision was influenced by its conflict of interest. The Court will accordingly review Hartford's denial for abuse of discretion, with a "low level of skepticism" given to Hartford's structural conflict of interest. *Abatie*, 458 F.3d at 968.

### 2.   Evidence outside the record

In support of her Motion for Summary Judgment, Cady submitted the report of Dr. Carl Wigren, a purported expert forensic pathologist. (Dkt. 67-1, Ex. D.) Hartford seeks to strike Dr. Wigren's report because Cady could have, but failed to submit the report during Hartford's review of Cady's claim. (Dkt. 69, p. 4.) In general, a plan administrator's decision may be challenged by seeking judicial review of only the record

---

11 Cady claims Hartford's interpretation would wrongfully exclude accidental death coverage for an engineer who accidently takes his wife's estrogen medication before going for an evening run and then, unrelated to the effects of that drug, is struck by a car while in a cross-walk, or for an attorney who smokes marijuana before boarding a plane and is then killed when the plane crashes shortly before landing. (Dkt. 66, pp. 9-10.) Unlike in these examples, there is no evidence in this case of any accident independent from drug use pursuant to medical treatment or without a prescription which caused Mr. Marsh's death.

MEMORANDUM DECISION AND ORDER - 24

developed during the administration of the claim.   *Kearney v. Standard Ins. Co*., 175 F.3d 1084, 1091 (9th Cir. 1999).   This Court has previously determined that, regardless of the appropriate standard or review, a court "may not take additional evidence merely because someone at a later time comes up with evidence that was not presented to the plan administrator."   *Podolan v. Aetna Life Ins. Co.*, 909 F.Supp. 1385, 1386 (D. Idaho 1995) (*citing Mongeluzo v. Baxter Long Term Disability Plan*, 46 F.3d 938, 940 (9th Cir. 1995).

Cady argues her expert report suggests several critical errors in the Coroner's processing of Mr. Marsh's death.   (Dkt. 66, pp. 7-8.)   However, as previously mentioned, both Hartford's Initial Denial and Final Denial rested, in part, on the Coroner's Report and the Toxicology Report.   Cady thus had notice that any evidence, including expert analysis, which called into question the validity of either the Coroner's Report or the Toxicology Report would undermine Hartford's denial of benefits.   Hartford also continually invited Cady to submit any additional evidence which would support her claim.   Although Cady claims she made Hartford "multiple offers to provide expert analysis supporting her claim," Cady does not dispute that she never actually provided Hartford with Dr. Wigren's report.   (Dkt. 72, p. 4.)   As other courts have noted, "'Congress intended plan fiduciaries, not the federal courts, to have the primary responsibility for claims processing.' Claimants *must* present their strongest available case to the plan administrator, because the primary decision is made at that point."   *Duhon v. Texaco Inc.*, 15 F.3d 1302, 1309 (5th Cir. 1994) (*citing Makar v. Health Care Corp*., 872 F.2d 80, 83 (4th Cir. 1989)) (emphasis in original).

**MEMORANDUM DECISION AND ORDER - 25**

If Cady believed Dr. Wigren's analysis was necessary for Hartford to make a proper determination, Cady should have submitted it to Hartford.   Having failed to do so, Cady's offer of additional evidence at this point "amounts to nothing more than a last-gasp attempt to quarrel with" Hartford's determination.   *Davidson v. Prudential Ins. Co. of Am.*, 953 F.2d 1093, 1095 (8th Cir. 1992); s*ee also Sandoval v. Aetna Life and Cas. Ins. Co.*, 967 F.2d 377, 381 ("In effect, a curtain falls when the fiduciary completes its review, and for purposes of determining if substantial evidence supported the decision, the district court must evaluate the record as it was at the time of the decision.").   The Court accordingly grants Hartford's motion to strike Dr. Wigren's report.

### 3.  Coverage under the Policy

Under an "abuse of discretion" standard of review, even when tempered with low skepticism given Hartford's structural conflict of interest, Hartford prevails.   This standard requires that the Court uphold the administrator's decision "if it is based upon a reasonable interpretation of the plan's terms and was made in good faith."   *Estate of Shockley v. Alyeska Pipeline Ser. Co.*, 130 F.3d 403, 405 (9th Cir. 1997).   Both of these conditions are met here.   As explained, *supra*, Hartford did not misinterpret the terms of the Policy, afforded Cady the full and fair review of her claims required by ERISA, and had an abundance of evidence favoring its determination.   Hartford cannot be found to have

abused its discretion in denying benefits under such circumstances.[12] *Bartholomew v. Unum life Ins. Co. of America*, 588 F.Supp.2d 1262, 1273 (W.D. Wash. 2008).

Moreover, Hartford's review and denial of Cady's claim must also be considered in light of Cady's failure to meet her burden of proof with respect to establishing coverage in the first place. Cady has the initial burden of establishing—by a preponderance of the evidence—that Hartford's conclusions were legally and/or factually wrong, and that Mr. Marsh's death fell within the terms of the policy.[13]  *Mers v. Marriott Int'l Group Accidental Death and Dismemberment Plan*, 949 F.Supp. 1323, 1329 (N.D.Ill. 1996) ("*Mers*"); *see also Muniz v. Amec Const. Management, Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010) (plaintiff suing under 29 U.S.C. § 1132(a)(B)(1) bears the burden of proving entitlement to benefits).

Again, the Policy defines "injury" as "bodily injury resulting directly from accident and independently of all other causes which occurs while the Covered Person is covered under the policy.  Loss resulting from…medical or surgical treatment of a sickness or disease is not considered as resulting from Injury."  (Dkt. 29-1, HCF 19.)  Thus, "to

---

12  In *Bartholomew*, the court noted that where the decision to grant or deny ERISA benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question of whether discretion has been abused before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.  *Id*., at 1266 (citing *Bendixen v. Standard Ins. Co*., 185 F.3d 939, 942 (9th Cir. 1999).

13  Cady would first have the burden of proof with respect to establishing coverage even if this Court credited Cady's claims of conflict of interest and reviewed Hartford's denial of benefits *de novo*.  *Id*.

**MEMORANDUM DECISION AND ORDER - 27**

mount even a credible challenge" to Hartford's denial of benefits, Cady must, "at a minimum," satisfy her burden of showing that Mr. Marsh's death was (1) caused by an "accident," (2) resulted "directly and independently from all other causes," and (3) was not caused by and did not result from treatment of a sickness or disease.  *Mers*, 949 F.Supp. at 1330.

Cady has not presented any admissible evidence, let alone a preponderance of evidence, to establish that Mr. Marsh's death was caused by "an accident,"[14]  that this accident resulted "directly and independently" from all other causes, or that the death was not caused by and did not result from treatment of Mr. Marsh's depression.   By contrast, Hartford relied upon substantial evidence, including the Proof of Loss, the Certified Death Certificate from the State of Idaho, the Nez Perce County Coroner's Report, the Toxicological Laboratory Report, medical records from Dr. Baldeck, prescription history records, and review of the claim file by Hartford's Clinical Case Manager, Kathleen Bell, to determine Mr. Marsh's death was not a covered loss under the Policy.   (Dkt. 70-4, HCF 137.)   Substantial evidence supports Hartford's determination that Mr. Marsh's death was not a covered loss.

---

14  Under Idaho law, an accident is an event that is not readily foreseeable, is unexpected, extraordinary, unlooked-for, or which cannot be prevented.  *Estate of Dumoulin v. CUNA Mut. Group*, 248 P.3d 1252, 1255 (Idaho 2011) (citations omitted); *see also Padfield v. AIG Life Ins. Co*., 290 F.3d 1121, 1126 (9th Cir. 2002) (a death may be deemed accidental under an ERISA group policy if the death was unexpected or unintentional).   Mr. Marsh's death due to taking substantially more than his prescribed level of Xanax, combined with Cymbalta, Zyprexa, Methadone and Marijuana, cannot be considered "unexpected", "unforeseeable" or "extraordinary."

Cady incorrectly asserts throughout her briefing that Hartford instead has the burden of proof because it based its denial upon two exclusions.   (Dkt. 72, p. 8; Dkt. 73, p. 5.)   While it is true that Hartford must "carry the burden of proving the applicability of any plan coverage exclusion it seeks to invoke," such as the prescription drug exclusion, the definition of "injury" is tied to the benefits section of the policy, rather than to the exclusions section.   *Farley v. Benefit Trust Life Ins. Co*., 979 F.2d 653, 658 (8th Cir. 1992).   As such, the definition of "injury" as not including medical treatment is not an exclusion, but is a clarifying definition associated with benefits.   *Id*.   Cady thus has the burden of proving Mr. Marsh's death was an "injury" under the meaning of the Policy.   *Id*. (plaintiff had burden of proving coverage for "medically necessary care" where such language was tied to the benefits section of the policy, rather than to exclusions); *see also Sabatino v. Liberty Life Assur. Co. of Boston,* 286 F.Supp.2d 1222, 1232 (N.D. Cal. 2003) (finding plaintiff had the burden of proving she was disabled under the meaning of the plan in order to make a *prima facie* showing of coverage, and, once coverage was established, defendant had the burden of proving the applicability of coverage exclusion); *Lincoln Nat'l Life Ins. Co., v. Evans*, 943 F.Supp. 564, 567 (D. Md. 1996) (ERISA supports placing the burden of proving that death was a result of accidental injury upon the claimant).   To the extent Mr. Marsh's death was caused by consumption of drugs he obtained pursuant to medical treatment, it did not result "directly and independently from all other causes" and was not covered under the Policy.   Cady thus has not, and cannot, meet her burden of proving Mr. Marsh's death was covered under the Policy.

**MEMORANDUM DECISION AND ORDER - 29**

Finally, Hartford has met its burden of establishing the prescription drug exclusion applies to the extent Mr. Marsh's death was caused by his use of Methadone.   During the course of its review, Hartford obtained the medical records for Dr. Baldeck, Mr. Marsh's only known treating physician.   Dr. Baldeck's records indicated both that Dr. Baldeck had not prescribed Methadone and that Mr. Marsh was not being treated by any other physicians.   (Dkt. 70-1, HCF 125-26.)   Mr. Marsh's Walmart prescription list also revealed that Mr. Marsh did not have a prescription for Methadone.   (Dkt. 71-1, HCF 131.)   Since it did not have any evidence of a prescription for Methadone with any other pharmacy or from any other physician, Hartford advised Cady that it would consider any documentation that confirmed a prescription was written for Methadone, or any other evidence that Mr. Marsh took Methadone as prescribed by a physician.   (Dkt. 70-4, HCF 138.)   Prior to Hartford's Final Denial, Cady's attorney confirmed that he had no documentary evidence to confirm Mr. Marsh had a prescription for Methadone.   (Dkt. 70-3, HCF 132-35.)   Because substantial evidence supports Hartford's conclusion that Mr. Marsh did not have a prescription for Methadone, and because there is no evidence to suggest Mr. Marsh did have a prescription for Methadone, Hartford has met its burden of establishing Mr. Marsh's death was excluded from coverage to the extent it resulted from his use of Methadone.

In order to recover under the Policy, Cady had the burden of proving by a preponderance of the evidence that Mr. Marsh's death was caused directly and independently of all other causes, and that his death did not result from medical treatment

**MEMORANDUM DECISION AND ORDER - 30**

of sickness or disease.   Even under a less deferential abuse of discretion standard of review that accounts for Hartford's inherent conflict of interest, this Court concludes, as a matter of law, that Hartford's determinations (1) that Mr. Marsh's death was caused by drugs taken pursuant to medical treatment and drugs taken without a prescription and (2) that, consequently, his death was not covered by the Policy, were reasonable and appropriate in light of the evidence, the largely undisputed facts, and the relevant judicial precedent.   Consequently, summary judgment should be granted in favor of Hartford and against Cady.

## ORDER

Now, therefore, it is hereby ordered that Hartford's Motion for Summary Judgment (Dkt. 70) is **GRANTED**, and Cady's Motion for Summary Judgment (Dkt. 64) is **DENIED**.   Accordingly, Cady's claims pursuant to 29 U.S.C. § 1132(a)(1)(B) are dismissed with prejudice.

DATED: March 13, 2013

Edward J. Lodge
United States District Judge

**MEMORANDUM DECISION AND ORDER - 31**